

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00195-CR

———————————————————

ANTHONY JORDAN PATTERSON, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1749378

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

Appellant Anthony Jordan Patterson appeals his convictions for two counts of engaging in organized criminal activity (EOCA), one count of murder, and one count of assault causing bodily injury. *See* Tex. Penal Code Ann. §§ 19.02 (murder), 22.01(a)(1) (assault causing bodily injury), 71.02(b) (EOCA). In six issues, Appellant argues that the evidence is insufficient to support his convictions and that the trial court erred by denying his motion to quash the EOCA counts in the indictment, by denying his request to clarify the jury charge, and by overruling his objections to two exhibits. Because sufficient evidence supports Appellant's four convictions, because the trial court did not err by denying his motion to quash or his request to clarify the jury charge, and because Appellant failed to adequately brief his complaint about the admission of two exhibits, we affirm.

### II. Background

"It was all about a hat." That sentence from the record summarizes why the victim in this case was murdered.

On the evening of October 23, 2020, Christopher Johnson (the victim) went with two of his friends to the Eight Ball bar in Sansom Park; the victim was wearing a ballcap that displayed "81" across the top. That number is known to represent the

Hells Angels outlaw motorcycle gang.[1] Although the victim had no ties to any criminal street gang,[2] because of his hat, others at the bar treated him as if he were a member of the Hells Angels. Appellant, who was among those at the bar (known for "being one that the outlaw motorcycle gangs . . . typically hung out in"), removed the hat from the victim's head, and when the victim attempted to leave, he was stabbed by another bar patron who was a member of the Pagan's[3] gang. Because Appellant challenges the sufficiency of the evidence,[4] we detail the events that led up to the hat snatch and the eventual murder, and we identify the gang members who were involved but defer a summary of the gang evidence until our discussion of the EOCA sufficiency issue.

---

[1] The number 8 represents the letter H, and the number 1 represents the letter A.

[2] Some witnesses used the term "outlaw motorcycle gang" when referring to a gang, but the EOCA statute uses the term "criminal street gang." *See* Tex. Penal Code Ann. § 71.02(a)(1).

[3] The State notes that "Pagan's" is the correct spelling for the group.

[4] The voluminous record from the five-day retrial on guilt–innocence spans almost 1,100 pages, not including over 1,200 pages of exhibits. The record from the original trial that ended in a mistrial was also filed with this court, but we do not reference it.

**A.    The Members Arrive at the Bar**

This case presents a large cast of characters. To assist the reader, we briefly identify the main characters before summarizing the testimony about how they each arrived at the bar:

- The victim's group mainly included Chris Tomlin, who drove the victim to the bar, and Ryan Lovett, who rode to the bar with three other friends in their party.

- Nate McCurdy, the person who stabbed the victim, had among those in his direct group Christopher Bailey and a man identified as "Bayou."

- Appellant, who snatched the victim's cap and later assaulted Tomlin, had within his group Wesley Rickert and an unidentified female, and they met Jesse O'Bannon at the bar.

- Two masked men also participated in the incident.

At trial, Bailey (who self-identified as a member of the Pagan's) testified that fellow Pagan's member McCurdy called him on or about October 23, 2020, and said that the Hells Angels were "holding up the door," that he could not get out of the bar, and that he was scared.[5] Bailey went to the Eight Ball and by happenstance parked on the passenger side of the car that the victim had arrived in. Bailey saw McCurdy come out of the bar and go back in while wearing an eight-inch knife on his waist; the situation did not seem to be as McCurdy had described it. While Bailey was outside,

---

[5]Bailey said that Appellant never called him and that he (Bailey) never called Appellant.

4

he saw Appellant drive up in a truck with three passengers.[6] Bailey did not approach Appellant but went toward the bar.

Before Bailey walked inside the bar, he received a text message from McCurdy with a photo of the victim wearing a hat with 81 on it. Bailey sat down at the bar, ordered a drink, and spotted the person wearing the 81 hat. Bailey also spotted Appellant, McCurdy, O'Bannon, Rickert, and Bayou.

Lovett testified that he was with the victim, Tomlin, and three others on the night of October 23 into the morning of October 24, 2020. While they were at the Eight Ball, a group of people who were sitting near the door by the parking lot stared at them and pointed at the victim.

Bailey saw two men wearing masks and hoodies[7] come in the bar and walk straight up to the victim and surround him. Lovett, who was nearby, heard the masked men tell the victim, "Can't be wearing that hat here." Bailey knew the two

---

[6]According to defense witness Rickert, Appellant had been planning to have Rickert tattoo the back of his head on the night of the incident but got nervous and decided they should go get a beer. Rickert said that Appellant drove him and a female to the bar and that they met O'Bannon there.

[7]This incident occurred during the COVID-19 pandemic, but no one else in the bar had their faces covered. We use the term "masked men" instead of referencing them by their hoodies (as the record does) because many of the bar's patrons were also wearing hoodies.

men were affiliated with the Mongols; thus, he believed that they were Appellant's people.[8]

Tomlin, who had driven the victim to the bar, said that when the two masked men approached the victim and Lovett, Tomlin tried to see what was going on. McCurdy grabbed him by the shoulder and said, "You don't want any part of this." Shortly after the masked men entered the bar and started talking to the victim, Appellant approached and stood a few feet away watching the interaction closely.

### B. The Hat Snatch and the Stabbing

While the masked men surrounded the victim, Appellant "yanked the hat off" the victim's head and walked out the side door with the hat in his hand. Bailey's understanding was that Appellant had kept the hat as a trophy.

Bailey then saw the victim heading outside; to Bailey, it appeared that the masked men were forcing the victim to leave the bar.[9] McCurdy, and many others (including Bailey), headed out of the bar toward the victim in the parking lot; Tomlin was the last one to exit the bar because a woman detained him and urged him not to go outside.

---

[8]On cross-examination, Bailey clarified that he assumed that both of the masked individuals were Mongols members because he knew for sure that one was.

[9]Tomlin testified that the masked men had motioned the victim and Lovett to the door.

As soon as Tomlin clicked his key fob to unlock his car doors and the headlights blinked, they all got "swarmed on" by ten to twelve people.[10] According to Tomlin, Lovett and the victim were "hindered by everybody stopping them from getting in the car." Tomlin said that one or two guys were on him on the driver's side and that all the rest of the swarmers were on the passenger side with the victim and Lovett; similarly, Lovett testified that three or four swarmers were on the passenger side of the car with him and the victim and that one or two people were on the driver's side attacking Tomlin, though Lovett could not see who was attacking Tomlin. Tomlin also could not see what was happening on the passenger side of the car because of the darkness; he could only hear grunting, pushing, shoving, and Lovett's yelling, "[G]et in the car!" Tomlin believed that if he were unable to get in the car, he would be seriously injured or killed.

Bailey observed that the victim and Lovett were being attacked. Bailey said that there were five people on the passenger side of the vehicle: the victim, McCurdy, Bailey, Lovett, and someone named Kade or Pitbull. Bailey saw McCurdy pull out his knife to attack the victim, and Bailey got between them and put his arms around the victim to get him away from the situation and the vehicle, but Bailey got stabbed a few times in the process.

---

[10]Bailey testified that some people were in the parking lot watching because they were providing security for the people who were involved in the fight. We describe below the role that Appellant played in the "swarming."

7

Bailey did not see Tomlin get attacked and did not know where Appellant was because he was "not [Bailey's] priority at that moment." Bailey admitted that Appellant was in the parking lot, but he did not know where he was when "it all broke loose."[11]

Tomlin was the first person who managed to get in the car, and he yelled for the victim and Lovett to get in. Tomlin said that Lovett fell into the car and that the swarm closed the door so that he could not get out to help the victim. Tomlin reached over to the passenger side and grabbed the victim's sweatshirt to pull him into the car. While Tomlin was trying to get everyone in the car, his car was still swarmed. He could not drive forward due to a parking block.

It was not until the victim got in the car that he mentioned that he had been stabbed. Tomlin was eventually able to back out.

When Tomlin drove off, Bailey went back inside the Eight Ball.[12] He did not know that the victim had been stabbed, but he saw McCurdy throw his knife in the street.[13]

---

[11]When Bailey was recalled by the defense, he said that Appellant was on "the other side of the vehicle," meaning that he was on the driver's side because Bailey was on the passenger side.

[12]Bailey did not stay at the Eight Ball for long; McCurdy wrapped Bailey's arm and then drove him to the hospital.

[13]While Bailey testified during the trial, he saw Appellant mouth to him the words, "You're dead."

## C.    The Victim's Death

Meanwhile, Tomlin stopped the car a few businesses down from the Eight Ball and checked on the victim, who had multiple wounds.  Tomlin called 911 and went toward the hospital.  They ended up pulling over to meet up with an ambulance that was en route, and the police came as well; when the ambulance arrived, the victim was "[j]ust barely" conscious.

While the police were processing Tomlin's car, they told him that the victim had died on arrival at the hospital.  According to the deputy medical examiner, the victim suffered a five- to six-inch stab wound that cut through the right lung tissue and airways.  The cause of death was a stab wound to the back, and the manner of death was homicide.

## D.    Tomlin's Injuries

Tomlin said that while trying to get into his car, he was punched approximately four times in the side of his head; he had redness on the left side of his face, on his ear and behind it, and underneath his hairline, as well as a scratch on the left side of his face.  The State introduced photographs that were taken the night of the assault. Tomlin testified that he did not feel pain at the time that the blows were inflicted but was sore the next morning.

## E.    The Video Evidence

Mark Porter, a forensic video analyst with the Tarrant County Criminal District Attorney's Office, spent thirty to forty hours reviewing video footage from the sixteen

cameras that were in and around the Eight Ball and assembled clips from them into State's Exhibit 193, an hour-and-twenty-minute compilation video, so that the viewer could follow the events in chronological order.[14]  State's Exhibit 193 was played for the jury and was stopped numerous times so that Porter could identify the individuals and summarize their actions.

Based on Porter's review of the videos, McCurdy and Bayou spent time at the Eight Ball before the arrival of the victim and Appellant.  McCurdy, Bayou, and a woman walked out of the Eight Ball and headed toward the 50/50 (another bar).

Lovett, Tomlin, the victim, and their three friends arrived and were inside the Eight Ball before McCurdy returned.  According to Porter, when McCurdy returned to the Eight Ball, he could have seen the 81 hat on the victim if the victim was facing away from the door because he was wearing the hat backwards with the bill in the back.  McCurdy walked by the victim but did not confront him.

Porter then showed clips of the victim and his friends coming and going from the bar and how McCurdy followed and made a phone call; Porter opined that whenever the victim made a move, McCurdy made a move.

During one of the times when the victim had walked outside the bar, a truck, which Porter associated with Appellant, pulled up and parked parallel to the building.

---

[14]To State's Exhibit 194, which was a three-and-a-half-minute compilation of videos from two surveillance cameras that were located at the storage-unit business behind the Eight Ball, Porter applied a magnification filter to focus on what happened in the parking lot.

10

Another vehicle arrived, and Porter testified that it belonged to Bailey. Bailey sat in his vehicle for a long time.

Around the same time that Bailey arrived, McCurdy came out of the bar's side door into the parking lot. According to Porter, McCurdy walked alongside Bailey's car and later walked in the direction of Appellant's pickup.[15] Porter testified that when a vehicle drove down the street next to where Appellant's truck was parked, the lights illuminated the individuals who were outside the truck, and he could see McCurdy with them because the other individuals had on dark clothing.[16] Moments later, McCurdy walked "[f]rom the general area of the street . . . where the pickup [was] located" and entered the bar's side entrance.

After McCurdy was inside the bar, another vehicle arrived in the parking lot; Porter testified that the vehicle was associated with O'Bannon. O'Bannon exited his vehicle and went to Appellant's truck where a few people were gathered. The group ultimately walked toward the Eight Ball.

Porter testified that Rickert, Appellant, and O'Bannon all entered the bar together that night and sat with McCurdy in a spot that was out of the surveillance

---

[15]Porter testified that there were no windows on that side of the bar to look out into the parking lot; thus, McCurdy would not have been able to see when Appellant arrived or where he parked his truck.

[16]Porter testified that Appellant's clothing appeared "medium to dark-colored" in the images; that Rickert had dark-colored pants and a medium to dark-colored top; and that McCurdy and Bailey were the only individuals involved who wore light-colored clothing, which made it easier for Porter to track and identify them.

cameras' range.[17]  Porter said that McCurdy had spent time on his cell phone earlier in the evening, but that stopped once Appellant arrived.

While this was going on inside the bar, a vehicle belonging to one of the masked men arrived.  According to Porter, when the first masked man arrived, Appellant's phone lit up.  As the masked man stood near his truck and waited, a white or light-colored car arrived and backed into a spot near the masked man's truck. Porter associated this vehicle with the other masked man.

The masked men walked together from the parking lot into the Eight Ball and went straight to the victim, who was sitting at the bar.  Although not mentioned by Porter but highlighted by others who testified, the video shows that one of the masked men attempted to remove the victim's hat but was unsuccessful.

Appellant came into view and stood several feet away from the masked men and the victim.  McCurdy walked in front of Appellant and stood right by the masked men; as that was happening, Appellant attempted to use his sweatshirt to cover his face but then dropped it.  Appellant then moved toward the victim and took his 81 hat before exiting the bar.

State's Exhibit 194 revealed that Appellant exited the door of the bar at 1:15 a.m. on October 24, 2020.  After showing that video, Porter testified that Appellant entered the driver's side of his truck and that Rickert, O'Bannon, and the unknown

_____

[17]On cross-examination, Porter said that McCurdy and Bayou were "in that area," not necessarily at the same table as Appellant.

12

female also got into the truck. The video reflects that Appellant did not leave the Eight Ball immediately; instead, he and his passengers sat in his truck. According to Porter, the victim and Lovett then appeared in the parking lot, as well as the two masked men.

Porter identified McCurdy's entering the parking lot, which coincided with Appellant's driver's side door opening and his exiting his truck. Appellant walked in front of his truck and then ran toward Tomlin's car while the passengers exited his truck; additionally, the other individuals who had exited the bar and were in the parking lot gathered around the back and sides of Tomlin's vehicle.

Porter testified that Appellant appeared in the parking lot after emerging from between two vehicles and that he was located "at the rear of the vehicle." To Porter, Appellant appeared to interact with the individuals.

After allowing the video to progress seven seconds, Porter testified that McCurdy and Bailey were on the passenger side of Tomlin's vehicle and that Appellant was no longer visible. Porter opined that Appellant was on the driver's side of Tomlin's vehicle. According to Porter, at one minute fifty-five seconds, the video shows three people in dark-colored clothing, and he identified them as Appellant, Rickert, and O'Bannon and said that Rickert and O'Bannon were removing Appellant from the driver's side of the vehicle.

Although the video appears to show that others in dark clothing—Rickert, O'Bannon, and the two masked men—gathered on the driver's side at various points,

13

according to Porter, the masked men moved to the passenger side to clear a path for Appellant.[18] Porter testified that he could place only two individuals—Appellant and Tomlin—on the driver's side of the vehicle and that only Appellant could have inflicted injuries on Tomlin. Appellant then ran to his truck and entered through the driver's side door; his passengers also returned to the truck.

After Tomlin's car left, the video showed that the following vehicles left: Appellant's truck, O'Bannon's vehicle, the dark-colored truck that the first masked man had arrived in, and the light-colored small car in which the other masked man had arrived.

Porter testified that he was able to identify McCurdy and Appellant as being at Tomlin's vehicle at the time of the victim's murder.[19] Porter opined that Appellant was involved in the murder based upon his analysis and observation of the individual that he tracked leaving the bar, getting into the driver's side of the pickup truck on the street, exiting the pickup, and going forward to the location of Tomlin's car on the driver's side.[20] Porter linked Appellant and McCurdy because the video showed

---

[18]When Porter was asked if a masked man was involved in the victim's murder, he initially responded, "No." But when asked, "He's not at the vehicle when [the victim] is murdered?" Porter responded, "Well, he is, yes. He is in the proximity where it occurred."

[19]Porter admitted that the video did not show when the victim, who was on the passenger side of Tomlin's vehicle, was stabbed.

[20]The Sansom Park Chief of Police also agreed that Appellant was complicit in the victim's murder.

McCurdy's talking to Appellant at Appellant's truck before Appellant entered the bar, McCurdy's standing with Appellant at the back of the bar getting a beer, and McCurdy's hanging out with Appellant "in [the cameras'] blind spot the entire night before the murder" occurred.

## F. The Arrests

No arrests were made until February 2021—approximately three months after the incident. In February 2021, Bailey, McCurdy, and Appellant attended the Pagan's national party that was held in Greenville, Texas, and were arrested at that event for their roles in the victim's murder.

## G. Appellant's Eyewitness's Views on the Events

As noted briefly above, Rickert's story was that he and Appellant, as well as an unknown female, had gone to the Eight Ball based solely on Appellant's desire to grab a beer to get over his nervousness at getting a head tattoo, and the remainder of Rickert's testimony attempted to paint a picture of how they were merely bystanders with no connection to McCurdy's plan for the evening. According to Rickert, Appellant did not receive any text messages or calls telling him to go to the Eight Ball on the night of the murder. Appellant and Rickert went on their own, contacted O'Bannon, and told him to meet them there.

Rickert said that he, Appellant, and a female went to the Eight Ball and that O'Bannon arrived in a different vehicle shortly thereafter. Despite the video

evidence, Rickert did not recall McCurdy's coming out to the truck to visit with them before they went inside the bar.

When they were inside the bar getting drinks, McCurdy said hello in passing.[21] After they got their drinks, the four in their group (Rickert, Appellant, the female, and O'Bannon) went and sat down; McCurdy and Bayou did not sit with them. Rickert said that McCurdy and Bayou might have been in the vicinity but were not at their table.

Rickert said that Appellant made no phone calls "whatsoever" to tell others to come to the bar. But Rickert later admitted that the video showed Appellant on his phone in the bar.

Rickert saw Appellant take the hat off the victim's head. Rickert had no idea beforehand that Appellant was going to do that and did not know why he had done that. After the hat snatch, they (Appellant, Rickert, O'Bannon, and the unidentified female) went to the truck, which they sat in for a bit.

While sitting in the truck, they saw a fight in the parking lot, so they got out of the truck and went toward the fight. Rickert admitted that Appellant was on the driver's side of Tomlin's vehicle but said that he was just over there watching. Rickert did not see Appellant assault anyone, but he also admitted that it was pitch black; he said they were all standing around out of curiosity to see what was going on. Rickert

---

[21]Rickert considered McCurdy an acquaintance that he had seen once or twice before.

16

agreed that he also went to the driver's side of Tomlin's car. When asked whether he had gone to the driver's side to get Appellant, Rickert said, "Okay." Rickert was later asked if it was correct that he had walked down the driver's side of the victim's vehicle to get Appellant, and Rickert said, "Maybe not to go get him, but to go look." Rickert said that after seeing people get in a car "and burn off quickly," they ran due to instinct. Rickert did not know that McCurdy was going to murder the victim, and he did not know who Tomlin or Lovett were.

## H.    Trial Outcome and Appeal

After hearing the above evidence, the jury sent out multiple notes while deliberating. The jury ultimately found that Appellant, acting alone or as a party, was (1) guilty of EOCA for the victim's murder, (2) guilty of the victim's murder, (3) guilty of a lesser-included EOCA offense (assault causing bodily injury) as to Tomlin, (4) guilty of a lesser-included offense of assault causing bodily injury to Tomlin, (5) not guilty of EOCA aggravated assault as to Lovett, and (6) not guilty of aggravated assault as to Lovett. Appellant then perfected this appeal.

## III.  Sufficiency Challenges

In his first three issues, Appellant challenges the sufficiency of the evidence to support his convictions. After setting forth the sufficiency standard of review, we will analyze each of his complaints.

17

### A. Sufficiency Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608; *Yancey v. State*, No. 03-23-00251-CR, 2025 WL 2369482, at *5 (Tex. App.—

18

Austin Aug. 15, 2025, no pet. h.) (mem. op., not designated for publication) (stating that "[t]hough the video and testimony might support conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination").

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements."). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149

19

(Tex. Crim. App. 2021). Reversal on evidentiary-sufficiency grounds is restricted to the "rare occurrence" when a factfinder does not act rationally. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016).

## B. Sufficiency of EOCA Convictions

In his first issue, Appellant contends that the evidence is insufficient to support his convictions for two counts of EOCA.[22] Specifically, Appellant argues that there is "insufficient evidence to prove that [he] was a member of McCurdy's group at all" and that there is "insufficient evidence to prove [that he] was factually a member of any criminal street gang at the time of the offense." The State summarizes Appellant's argument as follows:

> [T]he evidence failed to establish a nexus or connection between the offenses and his membership in any criminal street gang because the evidence was insufficient to show that he and McCurdy were in the same criminal street gang or that he was a member of any street gang at the time of the offenses.

The evidence, however, demonstrates that he met the definition of "member" that has been established by case law.

---

[22]We address this issue first, rather than the sufficiency of the predicate offenses, because Appellant's gang membership was highly contested at trial. Moreover, if the evidence were not sufficient to establish Appellant's gang membership, he would be entitled to acquittal of his EOCA convictions.

### 1. The Law on EOCA

The EOCA statute states that

> [a] person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang or foreign terrorist organization, the person commits or conspires to commit one or more of the following:
>
> (1) murder . . . [or] assault punishable as a Class A misdemeanor . . . .

Tex. Penal Code Ann. § 71.02(a)(1). The Texas Court of Criminal Appeals has performed a grammatical analysis of the EOCA statute and has held that the statute's "intent to establish, maintain, or participate" language does not apply in a prosecution for engaging in EOCA as a member of a criminal street gang. *See Zuniga v. State*, 551 S.W.3d 729, 735 (Tex. Crim. App. 2018) ("As a matter of grammar and logic, the statute's intent clause applies only to the phrase that immediately follows it—'in a combination or in the profits of a combination'—but not to the subsequent phrase, 'or as a member of a criminal street gang[.]'"). A hypothetically correct jury charge then would require proof that Appellant, (1) "as a member of a criminal street gang," (2) committed or conspired to commit the murder of the victim and the bodily injury assault of Tomlin. *See id.*

To prove the "as a member of a criminal street gang" element of the offense, the hypothetically correct charge would have additionally required proof that

21

Appellant was acting as a member[23] of a group of "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." *See id.* (citing Tex. Penal Code Ann. § 71.01(d)). And the Court of Criminal Appeals has interpreted the word "as" in the phrase "as a member of a criminal street gang" to require proof that the defendant was acting "[i]n the role, capacity, or function of" a gang member at the time of the offense. *See id.* at 736 (quoting American Heritage College Dictionary 78 (3d ed. 1993) (defining the word "as")). Further, the Texas Penal Code defines "conspires to commit" as follows:

> "Conspires to commit" means that a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the acts of the parties.

Tex. Penal Code Ann. § 71.01(b).

## 2. Gang Evidence Presented at Trial

Many of the witnesses testified about the history of various gangs and identified the gang affiliations of the individuals who were at the Eight Ball on the night that the victim was murdered. The record also contains photographs and testimony about Appellant's gang tattoos and social-media posts in which he was seen wearing various gangs' colors. We summarize that evidence below.

---

[23]The Texas Penal Code does not define "member." *See generally* Tex. Penal Code Ann. § 71.01.

### a.     The State's Evidence

The State presented evidence that Appellant had multiple gang affiliations, including the Kinfolk, the Mongols, and the Pagan's. Jeremy Sheets, an intelligence operations specialist with the Bureau of Alcohol, Tobacco, Firearms, and Explosives in D.C. who tracks all violence attributed to outlaw motorcycle gangs and motorcycle clubs, testified that the Pagan's and the Mongols teamed up for this murder because they had a common enemy: the Hells Angels. According to McCurdy's associate Bailey, if the Pagan's spotted a Hells Angel, the response was normally beatdowns that could include weapons.

Sheets and Bailey both testified that the Pagan's moved into Texas in early to late spring 2020. Many of the Kinfolk members "patched over" to start the Pagan's in Texas.

Bailey, who was vice president of the Kinfolk in early 2020, decided to join the Pagan's, as did McCurdy. Bailey said that the Mongols and the Pagan's were friendly to one another and that the Mongols were considered a brother club to the Pagan's.

Bailey said that in spring or summer of 2020, Appellant did not join the Pagan's but was instead "a Mongol hangaround."[24] Bailey testified that in one of the photos

---

[24]Bailey explained that the first step in gang membership is "hangaround" (i.e., hangs around the club and gets to know the members). The next step is prospect, which takes six months to a year, and the person can wear a prospect patch on a vest (also known as a "cut").

that was admitted into evidence, Appellant was wearing a tank top that had SYLM on it, meaning "Support Your Local Mongols." Bailey said that Appellant was president of the Mongols at that time but did not give a time frame. Bailey said that Appellant was not a member of the Pagan's when they were arrested in February 2021.

Additional photographs that were admitted into evidence showed Appellant's tattoos. On one side of Appellant's neck, he had two squares that were "stacked one on top of the other with a diagonal line from the top corner to the bottom corner"; this distinguished him from others who were at the bar on the night of the incident because they did not have a tattoo like that visible on their necks. The other side of Appellant's neck featured a "1 percent tattoo."

Officer Chris McAnulty, a gang-intelligence officer with Fort Worth Police Department, explained that the one-percent diamond tattoo on Appellant's neck is associated with motorcycle gang culture and that an individual would not be allowed to wear a one-percent diamond tattoo if he were not affiliated or part of that one-percent lifestyle. One of Appellant's tattoos was of Martin Palacios—a well-respected member of the Kinfolk. Officer McAnulty testified that Appellant also had a "16's"

---

Additionally, Sheets testified that if an individual is deemed a hangaround or a prospect, he is expected to engage in violence on behalf of the club if the club deems it to be necessary. Sheets explained that in winter 2018 when the president of the Pagan's made it his goal to be "the largest and biggest and baddest outlaw motorcycle gang," an individual who engaged in violence could move up one rung on the ladder to either become a bona fide hangaround or a bona fide prospect and could be awarded violence-based or violence-attributed patches, tabs, or tags to wear on his cut.

tattoo, which is associated with the Pagan's, and that he got it after the police had contacted him in November 2022 but before the photograph was taken in December 2022. Also during that time frame, Appellant made social-media posts that led Officer McAnulty to believe that he was associated or affiliated with the Pagan's. But Officer McAnulty identified Appellant as "undecided" in 2020 when many of the Kinfolk "were patched over" to be part of the Pagan's.[25]

When the police made contact with Appellant in November 2022 while he was out on bond, he had gang patches in his wallet. Two of the patches were associated with the Kinfolk, while one patch was associated with the Pagan's. Officer McAnulty said that a black patch, like the Pagan's one in Appellant's wallet, is awarded after committing an act of violence.

Officer McAnulty testified that the City of Fort Worth is required to maintain a gang database. A person is removed from the gang database after five years if he is not rearrested or does not spend any time in prison. Officer McAnulty was aware of Appellant's involvement with the Kinfolk in 2016 and his arrest for a gang-related incident that year. Officer McAnulty said that Appellant was arrested in 2018 and was wearing a "Kinfolk cut" at the time of his arrest. Because of the 2018 arrest, Appellant's purge date from the gang database had been set for September 7, 2023.

---

[25]According to Rickert, Appellant was not a member of any outlaw motorcycle gang on October 23, 2020.

Based on Appellant's arrests in 2016 and 2018—both of which identified him as a member of Kinfolk—Officer McAnulty said that Appellant would have still been listed as Kinfolk in the gang database on the date of the murder. But Officer McAnulty did not believe that Appellant was a member at that time:

Q. Is it your belief that in 2020 he was a member of the Kinfolk?

A. It is my belief that he was shopping around, looking for a new club to join.

Q. But was he a member of Kinfolk while he was doing that?

A. No, sir. I don't believe that.

But when asked whether it was fair to say that Appellant holds himself out frequently as a member of a criminal street gang, Officer McAnulty stated, "In these [social media] posts and photos, yes, ma'am." In 2022, the Pagan's was added as a secondary gang under Appellant's profile in the gang database.

Officer McAnulty also explained the significance of the 81 hat and that it was the impetus for the events at issue because of how much respect is part of the motorcycle subculture:

[Appellant and McCurdy] misidentified [the victim] as a member of the Hells Angels. . . . [H]e [was] wearing the other team's colors per se.

This rival gang, this Hells Angels, he's still wearing their colors, and for him to wear those colors in their presence would be . . . a form of disrespect in their eyes that you were comfortable enough to wear this rival gang's attire or hat or support hat in our presence, in . . . our bar.

26

Officer McAnulty opined that Tomlin was assaulted even though he did not have on rival gang items because he was guilty by associating with the victim.

Officer McAnulty testified that the "swarming" exhibited on the night of the incident at the Eight Ball is the typical mode of operation of an outlaw motorcycle gang and that it is common for a gang to have people on the perimeter who make sure that no one jumps in or attempts to assist the person who is receiving that assault or that beatdown.[26]  Officer McAnulty said that the advantage of attacking Tomlin on the driver's side was to prevent the vehicle from leaving; here, "the three victims were essentially stuck in this very tight window where they [could not] escape."

Officer McAnulty opined that it was not outside the realm of possibility that the Mongols[27] and the Pagan's got together on October 23 to 24, 2020, and committed this homicide outside the Eight Ball.  Officer McAnulty noted that the Mongols had assisted the Pagan's on February 14, 2021, in Edinburg in shooting a Bandidos member who was leaving a strip club and in severely beating another member who was leaving the strip club.

---

[26]Officer McAnulty opined that based on Rickert's and O'Bannon's proximity to the victim's car during the incident, they were part of the security team that monitored what Appellant did during the murder.

[27]Officer McAnulty had no information that Appellant had ever joined the Mongols despite his posting numerous images of himself supporting them up until 2020.  After the incident, Appellant no longer posted photos of himself in Mongols-related clothing items but often posted photos in which he was wearing Pagan's-related clothing items.

Officer McAnulty testified that the State was not required to prove that Appellant was a member of the Pagan's at the time of the offense, only that he was a documented gang member. Officer McAnulty said that Appellant was a documented gang member in October 2020. Officer McAnulty believed that Appellant had changed his gang membership to the Pagan's after the incident because he was arrested with known gang members; he had associated with gang members;[28] and he had used hand signs, colors, and clothing to claim his gang affiliation. Officer McAnulty's opinion was that "this murder occurred and was a gang-related homicide due to the fact that the motive and the -- what everybody was going for and what their focus was on, was that Hells Angels support hat that was worn by [the victim]" and that the "hat is the reason this murder occurred."

When asked whether McCurdy was a documented member of any outlaw motorcycle gang at the time of this homicide, Officer McAnulty answered, "He was not." But he answered affirmatively when asked if it appeared in October 2020 as though he was committing a gang-related murder.

Officer McAnulty opined, based on his training and experience, that this appeared to be a calculated and coordinated attack. He based his opinion on the facts

---

[28]Officer McAnulty opined that the masked man who had arrived in the light-colored Nissan Altima had a physical body description that was consistent with Leland Everton, who was with the Pagan's. Additionally, although Bailey was not documented as a member of a criminal street gang at the time of the offense, he was subsequently documented as part of the Pagan's; on his arrest, he identified himself and McCurdy as members of the Pagan's.

that the two hooded individuals arrived and went straight to the victim inside the bar; that Appellant's phone had illuminated when one of the masked men arrived in the parking lot; and that the masked men were affiliated with Appellant, not McCurdy.

### b. The Defense's Gang Expert

Dr. William Dulaney, an expert in motorcycle gangs, agreed that the Mongols and the Pagan's are sworn enemies of the Hells Angels but spent the bulk of his testimony generally opining on how Appellant was not a gang member and was not working with the masked men:

- He stated that wearing support gear for two separate clubs does not make a person a member and that a person cannot simultaneously be a member of two outlaw motorcycle gangs.

- He testified that outlaw motorcycle gangs typically do not order their hangarounds to commit criminal activity because the outlaw motorcycle gangs "don't know those people hardly at all" and "won't even speak with them until they move on to the next level."

- He said that it is not common for individuals who are interested in joining a gang to commit crimes in order to make themselves more attractive to the gang.

- He testified that outlaw motorcycle gang members would not bring females with them to go attack someone.

- Based on his review of the documents, images, and videos, Dr. Dulaney opined that Appellant was not a member of the Pagan's, the Mongols, or the Kinfolk on the night of the incident. Dr. Dulaney was aware that at the time of the murder, Appellant was a member of the Kinfolk according to the documentation in the gang database and said, "A database is one thing[;] it has conceptual definitions that do have . . . a wide, broad scope[.]" The State asked Dr. Dulaney about who is considered to be a gang member in the State of Texas:

29

Q. So if the law says that [Appellant], in 2016, was a gang member; 2018 is a gang member, and that carries that -- that starts that clock over again for five years, would you agree with me that October 23rd, 2020, falls within that five-year period?

A. It does fall within the five-year period.

- Dr. Dulaney believed that Appellant knew from his time with the Kinfolk what the 81 on the hat meant and that he would want to de-escalate the situation because he was having a good time at the bar and did not want any trouble.[29]

- Dr. Dulaney saw no evidence that Appellant was working together with the two masked men.

- But Dr. Dulaney ultimately agreed that the murder and the attacks on others in Tomlin's car were related.

c. **The State's Rebuttal**

When the State recalled Officer McAnulty during rebuttal, he testified that in his experience, hangarounds "are constantly being directed . . . as to what to do at different . . . gatherings of these outlaw motorcycle gangs" and that the hangarounds are known well enough by the members to be directed to conduct whatever is asked of them by the organization, including committing a felony if need be. After being shown a photograph of Appellant with Bailey at the Pagan's clubhouse near Azle,

---

[29]Defense counsel argued in closing that Appellant was in a relationship with one of the Eight Ball's bartenders (as evidenced by his jail messages) and that it was reasonable to conclude that he had wanted to prevent a commotion for her and to defuse the situation by removing the offensive hat.

30

Officer McAnulty testified that a Mongol hangaround could be invited to the Pagan's clubhouse if he were known by an individual in the Pagan's.

Officer McAnulty did not believe that the victim's murder was a random act of violence. Officer McAnulty opined that the hat snatch inside the Eight Ball was related to the murder that occurred in the parking lot:

> Through my expert opinion, watching the -- the video and the actions that occurred after the hat snatch, the hat snatch was the prelude to the altercation and the eventual homicide that occurred outside. . . . [W]hile [the victim] is inside of the bar and while Nate McCurdy is inside the bar, there is no physical confrontation or physical acts committed . . . until [Appellant] snatches that hat off of [the victim's] head, and that is . . . the small spark that starts this campfire.

Officer McAnulty had nothing that he could point to in order to show that the motive for this case was not gang related.

### 3. Analysis

In arguing his first issue, Appellant spends multiple pages of his brief showing that he was not a member of the Kinfolk, the Pagan's, or the Mongols[30] at the time of the murder and assault. Appellant, however, takes too narrow a view of the evidence.

As mentioned above, although there is no definition of "member," the Texas Court of Criminal Appeals has defined "as" to mean acting "[i]n the role, capacity, or function of" a gang member at the time of the offense. *See Zuniga*, 551 S.W.3d at 736.

---

[30]Appellant also discusses a group that he was involved in that went by "DMF," but the record demonstrated that such group was more of a hobbyist group for those who enjoy anything with an engine. Because Officer McAnulty did not consider DMF a criminal street gang, we do not discuss Appellant's participation with that group.

Here, we have evidence that Appellant was acting "[i]n the role, capacity, or function of" a gang member at the time of the offense:

- McCurdy, who identified as a member of the Pagan's, went out to Appellant's truck and spoke with him before Appellant entered the bar (a known gang hangout), and this occurred after McCurdy had seen the victim wearing an 81 hat and after McCurdy had called Bailey about the Hells Angels being at the bar;

- Appellant's phone lit up when the masked men arrived in the parking lot;

- The masked men went straight to the victim and attempted to take his hat;

- When Tomlin tried to see what was going on, McCurdy grabbed him by the shoulder and said, "You don't want any part of this";

- Appellant then snatched the victim's gang-related hat—the same hat that McCurdy had sent Bailey a photo of—and went to his truck but did not leave;

- The masked individuals escorted the victim to the parking lot;

- Appellant exited his truck as McCurdy exited the bar, and Appellant went to Tomlin's vehicle;

- Appellant was seen on the driver's side of Tomlin's vehicle, while McCurdy repeatedly stabbed the victim on the passenger side of the vehicle;

- Tomlin was prevented from backing out his vehicle because one or two people were assaulting him; and

- Appellant left immediately after Tomlin drove away.

In addition to this evidence of Appellant's coordination with McCurdy on the night of the murder, we may, as part of our sufficiency review, look at events occurring before, during, and after the commission of the offense and may rely on actions of the defendant that show an understanding and common design to do the prohibited act. *Hammack*, 622 S.W.3d at 914. The record demonstrates that Appellant was already in the gang database for committing prior gang-related crimes in 2016 and 2018,[31] that he attended gang meetings (and was arrested at the Pagan's

---

[31]We note that when the State has previously argued that it need only show that the accused is listed in the statewide gang database without proving that he has any knowledge of the commission of criminal activities of the organization, the Texas Court of Criminal Appeals has disagreed, stating that

> [t]he [Texas] Legislature must surely have intended that, to be a member of a criminal street gang, the actor "must be one of three or more persons with a common identifying sign, symbol, or identifiable leadership *and must also* continuously or regularly associate in the commission of criminal activities." Otherwise, the statute would attach a *mens rea* to nothing more than membership in an organization. Membership alone does not make conduct criminal . . . .
>
> The *Flores* court properly clarified what conduct makes an individual a member of a criminal street gang: individual participation in crime. *Ex parte Flores*, 483 S.W.3d [632,] 645 [(Tex. App.—Houston [14th Dist.] 2015, pet. ref'd)].

*See Martin*, 635 S.W.3d at 679 (dealing with a gang member who had no prior convictions but was convicted of unlawfully carrying a weapon). Here, we have more than mere gang-database evidence. The record demonstrates that Appellant had prior gang-related convictions and that, as discussed below, he participated in the victim's murder and Tomlin's assault. *See Bittick v. State*, 707 S.W.3d 366, 371 (Tex. Crim. App. 2024) (upholding EOCA conviction and stating that the evidence that was found lacking in *Martin* was "amply brought to bear against [a]ppellant" who individually

national convention), that he posted photos on social media showing himself wearing gang-related clothing, that he had gang-related tattoos on full display on his neck, and that his wallet contained a Pagan's patch that was associated with committing an act of violence.

The jury could have inferred that Appellant was acting in the role, capacity, or function of a gang member on the night of the incident and had thereby earned the Pagan's patch by committing the offense at hand and that he had gained full membership in the Pagan's as demonstrated by the Pagan's tattoo that he acquired after the incident. The jury could also have inferred that there was no reason that Appellant would have snatched the victim's gang-related hat if he had not been functioning as a gang member, much less that he would have remained in his truck after taking the hat and then assisted McCurdy by joining him at the vehicle that the victim had arrived in. Moreover, the jury was permitted to reject the possibility that Appellant was acting due to an independent impulse and was permitted to draw the reasonable inference that Appellant was functioning as a gang member during the murder of the victim and the assault on Tomlin. *See Zuniga*, 551 S.W.3d at 739 ("The fact that it was theoretically possible that there was some non-gang related motive for the [crimes] is not the proper inquiry in a sufficiency review, in which we are bound to

---

participated in the crime pursuant to his gang membership based on his aggravated assault of the victim).

defer to the factfinder's weighing of the evidence and its drawing of reasonable inferences.").

Viewing all of the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could reasonably have determined the following basic facts: (1) Appellant was listed in the gang database for crimes that he had committed in 2016 and 2018 as a gang member; (2) the murder and assault took place at a location known to be frequented by gangs; (3) other gang members participated in the incident and in cooperation with Appellant; (4) the Hells Angels were confirmed to be a rival gang of both the Mongols and the Pagan's; and (5) the Pagan's response to spotting a member of the Hells Angels was normally a beatdown that could include weapons. From these basic facts, the jury was free to draw the reasonable inference that the coordinated assault on the victim and Tomlin by McCurdy and Appellant was gang-related activity.[32] *See Villa*, 514 S.W.3d at 233 (holding that the facts—that the attack on the victim was a gang-motivated crime, that other attackers were identified as gang members, and that appellant worked in concert with the other attackers— added support for the jury's conclusion that appellant was a gang member). Further, given the circumstances that show Appellant's cooperation with other gang members in committing these crimes against the victim who was wearing a rival gang's hat, as

---

[32]Appellant points to the multiple juror notes and concludes that the jury "was confused about what it legally meant to be a member of a criminal street gang." The jury, however, did not remain confused but instead implicitly found Appellant was a gang member when it found him guilty of two counts of EOCA.

well as against the victim's driver (who was assumed to be a gang member by his association with the victim), it was not irrational or speculative for the jury to infer that Appellant's commission of the assault on Tomlin and his participation in the victim's murder were pursuant to his role, capacity, or function as a gang member. *See Zuniga*, 551 S.W.3d at 738.

Accordingly, we hold that sufficient evidence supports Appellant's EOCA convictions. We therefore overrule Appellant's first issue.

## C. Sufficiency of Assault Conviction

In his third issue, Appellant argues that the evidence is insufficient to find that he was guilty of assaulting Tomlin.[33] Appellant contends that "[n]o witness[es who were] present that night in the parking lot of the bar testified that they saw Appellant assault any person"; alternatively, Appellant argues that if the evidence is sufficient to identify him as Tomlin's assailant, Tomlin's testimony that he did not feel pain at the time of the assault means that he would be guilty of only a Class C misdemeanor assault by contact, which would not support an EOCA (assault) conviction because a Class C misdemeanor assault is not a predicate offense for EOCA. Because the jury as the factfinder was free to believe Porter's testimony—developed after spending thirty to forty hours reviewing video footage and tracing Appellant's movements in

---

[33]Because the State's premise at trial was that Appellant's role in assaulting Tomlin was how he aided McCurdy in the victim's murder, we address Appellant's challenge to the assault conviction before his second issue challenging his murder conviction.

the parking lot—that placed Appellant on the driver's side of the vehicle where Tomlin was assaulted and because Tomlin's testimony about his injuries, as well as photographs of the injuries, substantiated the bodily injury element of the offense, we conclude that sufficient evidence supports the bodily injury assault charge.

### 1. Applicable Law

As applicable to this case, a person commits the offense of assault bodily injury if the person intentionally, knowingly, or recklessly causes bodily injury to another. Tex. Penal Code Ann. § 22.01(a)(1). The San Antonio Court of Appeals has further explained "bodily injury" as

> "physical pain, illness, or any impairment of physical condition." Tex. Penal Code Ann. § 1.07(a)(8). "Any physical pain, however minor, will suffice to establish bodily injury." *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012). "A fact[]finder may infer that a victim actually felt or suffered physical pain because people of common intelligence understand pain and some of the natural causes of it." *Id.* Notably, "[t]he existence of a cut, bruise, or scrape on the body is sufficient evidence of physical pain necessary to establish 'bodily injury' within the meaning of the statute." *Arzaga v. State*, 86 S.W.3d 767, 778 (Tex. App.—El Paso 2002, no pet.).

*Gonzales v. State*, No. 04-22-00483-CR, 2024 WL 3954228, at *5 (Tex. App.—San Antonio Aug. 28, 2024, no pet.) (mem. op., not designated for publication).

Additionally, as is applicable to both the murder charge and the assault charge, Appellant acknowledges that the jury charge contained a law-of-parties instruction:

> All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by

the conduct of another for which he is criminally responsible, or by both.

Each party to an offense may be charged with commission of the offense.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

### 2. What the Record Shows

As detailed in the background section, both Tomlin and Lovett testified that there had been one or two guys (whom they could not identify) on the driver's side attacking Tomlin as he tried to get into his car. Tomlin said that he was punched approximately four times in the side of his head. As a result, he had redness on the left side of his face, on his ear and behind it, and underneath his hairline, as well as a scratch on the left side of his face; the State admitted photographs showing his injuries. Although he did not feel pain at the time that the blows were inflicted, he was sore the next morning.

Porter claimed that he could place only two individuals—Appellant and Tomlin—on the driver's side of the vehicle and that only Appellant could have inflicted injuries on Tomlin. Porter opined that the masked men who had initially been on the driver's side had moved to the passenger side to clear a path for Appellant.

Rickert, who testified as a defense witness, admitted that Appellant was on the driver's side of Tomlin's vehicle but said that he was just over there watching out of curiosity to see what was going on. Rickert did not see Appellant assault anyone, but he also admitted that it was pitch black.

### 3. Analysis

Here, Tomlin, Lovett, Rickert, and Porter placed Appellant on the driver's side of the car when Tomlin was trying to get in. Despite this testimony, Appellant posits in his brief that Tomlin was likely struck by one of the masked men. But the jury, as the sole judge of credibility, was free to believe Porter's testimony that the videos showed that the masked men had moved to the passenger side, leaving Appellant as the sole individual with Tomlin on the driver's side of the car.

And even if one of the masked men was also on the driver's side of the car, the jury could have reasonably inferred that both Appellant and the masked man were the individuals who had assaulted Tomlin. Due to the law-of-parties instruction, it was not necessary for the State to show that Appellant was the sole perpetrator of the four punches to Tomlin in order to obtain a conviction on the assault charge; the jury could have convicted Appellant of assaulting Tomlin regardless of whether the masked man was also present on the driver's side during the attack. *See Goff v. State*, 931 S.W.2d 537, 544–45 (Tex. Crim. App. 1996) (holding that the facts best supported the theory that appellant was the principal actor but that there was also sufficient evidence to support the inference that he had acted as a party to the offense based on

the elicited testimony). The jury was able to view the video from the parking lot, as well as hear Porter's recap of what the video showed regarding Appellant's movements in the parking lot; from the video, the jury could see how long Appellant spent next to Tomlin's vehicle and how he ran back to his truck and drove away quickly. *See Yancey*, 2025 WL 2369482, at *6 (stating, in case in which the detective's testimony was largely based on the videos shown to the jury, "[t]he jurors could assess the video and testimony for themselves and use their own experience to assess the accuracy of [the detective's] observations and the reasonableness of his conclusions"). The jurors could have disbelieved the testimony that Appellant was merely watching the fight and instead could have reasonably inferred that Appellant was at that exact location in the parking lot—on the driver's side of the car while the victim was being stabbed—because Appellant was a participant in the assault.

Appellant also challenges whether the State proved that there was bodily injury because "Tomlin testified that he did not feel pain at the time of the assault." As explained above, testimony regarding pain is not necessary to establish bodily injury. *See Gonzales*, 2024 WL 3954228, at *5. Here, the jury could have concluded that Appellant had caused Tomlin bodily injury based on (1) his testimony that he had been punched four times in the head and that he had sustained injuries as a result of being punched and (2) the photographs depicting Tomlin's injuries. *See Smith v. State*, No. 03-23-00796-CR, 2025 WL 2147972, at *5 (Tex. App.—Austin July 30, 2025, no pet. h.) (mem. op., not designated for publication) (holding evidence sufficient to

40

establish bodily injury element of assault because officer testified that the victim had an abrasion under his eye and that it was slightly swollen and because photographs of the swollen eye were admitted); *Arzaga*, 86 S.W.3d at 778–79 (providing that the testimony—that the victim had swelling to her lips, had bruising, and had a cut—permitted "an inference by the jury that [the victim had] suffered physical pain" even though "[n]o witness directly testified that [the victim] suffered pain as a result of being struck"). Additionally, Appellant points to no case law, and we have found none, requiring that pain need be felt immediately upon contact in order to uphold a conviction for bodily injury assault. Instead, case law allows for the fact that a victim might not feel pain right away due to the shock of the events. *See Rudolph v. State*, Nos. 02-13-00240-CR, 02-13-00241-CR, 2014 WL 3696138, at *3 (Tex. App.—Fort Worth July 24, 2014, no pet.) (mem. op., not designated for publication) (holding evidence sufficient and stating that "[t]he jury could have reasonably inferred that [the victim's] swollen, split[-]open lip would have caused her physical pain after the shock and 'numb[ness]' of the events wore off"). Moreover, the jury heard Tomlin's testimony that he felt pain the next day.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is sufficient to establish that Appellant caused bodily injury to Tomlin. We overrule Appellant's third issue.

41

**D.     Sufficiency of Murder Conviction**

In his second issue, Appellant argues that the evidence is insufficient to support his murder conviction.   Specifically, Appellant contends that the evidence is insufficient to show that (1) he solicited, encouraged, directed, aided, or attempted to aid McCurdy in committing the victim's murder and (2) he knew that McCurdy intended to assault or murder the victim.   Because we must view all the evidence in the light most favorable to the verdict, we hold against Appellant.

**1.     Applicable Law**

As applicable to this case, a person commits the offense of murder if the person "(1) intentionally or knowingly causes the death of an individual[ or] (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual."   Tex. Penal Code Ann. § 19.02(b)(1)–(2).   As noted above, a law-of-parties instruction was included in the jury charge and applied generally to each count.  Applying the law of the parties to the murder statute to measure the sufficiency of the evidence against a hypothetically correct jury charge, Appellant is criminally responsible as a party to the offense if (1) he committed the murder himself or (2) McCurdy committed the murder and Appellant acted with the intent to promote or assist the commission of the offense by soliciting, encouraging, directing, aiding, or attempting to aid McCurdy to commit murder.  *See id.* §§ 7.01(a), 19.02(b)(1)–(2); *Adames v. State*, 353 S.W.3d 854, 862 (Tex. Crim. App. 2011).   Moreover, in determining whether a defendant is a party, the

42

factfinder may rely on events before, during, and after the commission of the crime; the defendant's acts showing an understanding and common design; and circumstantial evidence. *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985); *Qualls v. State*, 547 S.W.3d 663, 673 (Tex. App.—Fort Worth 2018, pet. ref'd).

### 2.    What the Record Shows

We briefly summarize the facts that show how Appellant aided or attempted to aid McCurdy with the victim's murder:

- McCurdy noticed the victim's Hells Angels hat and made a call to Bailey and later sent him a photo of it; McCurdy did not take action to remove the hat on his own.

- After Appellant parked, McCurdy walked passed Bailey's vehicle and straight to Appellant's truck, showing that they had been in communication because there were no windows on that side of the bar and it was very dark.

- McCurdy spoke to Appellant at his truck before he entered the bar.

- McCurdy was in the vicinity of Appellant's table throughout the time they were at the bar.

- Appellant's phone lit up when one of the masked men arrived in the parking lot.

- The masked men walked straight up to the victim at the bar and started talking to him.

- As the masked men spoke to the victim, Tomlin tried to see what was going on, but McCurdy grabbed him by the shoulder and said, "You don't want any part of this," thus indicating that McCurdy and Appellant had devised a plan.

43

- The masked men attempted to remove the victim's hat before Appellant did so successfully.

- Appellant did not drive away after he took the hat to his truck but sat and waited.

- The masked men ushered the victim and Lovett out of the bar to the parking lot, and McCurdy ultimately followed.

- As McCurdy exited the bar, Appellant got out of his truck and went to the car that the victim was trying to enter.

- Swarming is typical gang behavior, and coordinated swarming took place around Tomlin's car.

- The evidence placed Appellant on the driver's side of the car where Tomlin was assaulted.

- Tomlin could not get in the car and drive the victim to safety because Appellant, and possibly a masked man, were on the driver's side of the car assaulting Tomlin while McCurdy was stabbing the victim on the passenger side of the car.

### 3. Analysis

According to the State's brief,

[t]he evidence [i]s more than sufficient to show that [the victim] was murdered in a concerted group effort and that [Appellant] was an active participant in that group, helping to "swarm" Tomlin's car and preventing Tomlin from getting into the driver's seat to leave (and thus allowing McCurdy to stab [the victim] on the passenger side of the vehicle).

We agree.

Appellant, however, focuses on the fact that "[n]o evidence was presented by the State that McCurdy ever contacted Appellant before Appellant's arrival at the bar"

44

and that the one person (Bailey), whom McCurdy had called regarding the alleged presence of Hells Angels at the bar, testified that he did not know that McCurdy was going to murder the victim. Even though there was no direct evidence of McCurdy's contacting Appellant before Appellant arrived at the bar, the jury was entitled to infer from the evidence that there was contact between McCurdy and Appellant because the record demonstrates that McCurdy came out of the bar and went directly to Appellant's truck and spoke to him shortly after he parked—despite that the bar had no windows on that side of the parking lot to allow McCurdy to see when Appellant arrived and where he parked. Appellant concedes this fact but states that "[e]ven if McCurdy did in fact approach Appellant's group outside of the bar when they arrived, there was no testimony as to what was said." Appellant also notes that the State did not present any evidence of call logs showing who McCurdy and Appellant spoke to on their phones while they were at the bar. But the jury did not need testimony as to what McCurdy and Appellant discussed outside the bar or the phone logs to show whom each had called because the jury was entitled to rely on circumstantial evidence and could infer what had been said based on what played out. *See Lopez v. State*, No. 13-14-00733-CR, 2017 WL 930022, at *2 (Tex. App.—Corpus Christi–Edinburg Mar. 9, 2017, pet. ref'd) (mem. op., not designated for publication) ("The jury may also rely on circumstantial evidence in determining whether an individual is a party.").

As noted by the State, "[f]rom the timing of the arrivals[ of Bailey and later the masked men], the jury could have reasonably inferred that McCurdy and [Appellant] were

45

gathering gang members to help them respond to [the victim's] wearing the hat . . . ." Additionally, when the masked men approached the victim and before Appellant ever snatched the victim's hat, McCurdy grabbed Tomlin by the shoulder and said, "You don't want any part of this." The jury could have reasonably inferred that McCurdy had a plan and that the masked men and Appellant were aiding in carrying out that plan. *See generally Price v. State*, No. 08-22-00093-CR, 2023 WL 2733372, at *4 (Tex. App.—El Paso Mar. 30, 2023, pet. ref'd) (mem. op., not designated for publication) ("Parties acting together need not have an agreement in place but simply work together at the time of the offense to contribute some part toward execution of a common purpose."). Moreover, the jury heard Officer McAnulty opine that, based on his training and experience, this appeared to be a calculated and coordinated attack.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is sufficient to support Appellant's murder conviction as a party. *See Baker v. State*, No. 02-17-00193-CR, 2020 WL 1808292, at *5 (Tex. App.—Fort Worth Apr. 9, 2020, no pet.) (per curiam) (mem. op., not designated for publication) (holding evidence sufficient to support appellant's murder conviction as a party when the victim was murdered in a concerted group effort and appellant was an active participant in that group, helping to storm the bar and to contain the victim within the crowd, and thus allowing members of the crowd to beat and shoot him). Accordingly, we overrule Appellant's second issue.

## IV. Motion to Quash

In his fourth issue, Appellant argues that the trial court erred when it denied his motion to quash the indictment regarding Counts 1, 3, and 5[34]—the EOCA counts. The crux of Appellant's complaint is one based on double jeopardy, claiming that because the EOCA counts "alleged offenses from the same criminal episode that happened at the same time," he should have been held accountable for only a single act of EOCA. As discussed below, a plain reading of the statutes at issue confirms that Appellant was not punished twice for the same offense and that the trial court therefore did not err by denying his motion to quash Counts 1 and 3 of the indictment.

### A. Applicable Law and Standard of Review

The Fifth Amendment of the United States Constitution provides that no person shall have life or limb twice put in jeopardy for the same offense. U.S. Const. amend. V. Generally, this provision—the Double Jeopardy Clause—protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same

---

[34]The jury found Appellant not guilty on Count 5, so the portion of his fourth issue attacking the failure to grant his motion to quash Count 5 is moot. *See Segura v. State*, No. 13-03-098-CR, 2004 WL 5050889, at *3 n.1 (Tex. App.—Corpus Christi–Edinburg Aug. 26, 2004, no pet.) (mem. op., not designated for publication) (stating that any complaint regarding count one has been rendered moot by the jury's finding of not guilty as to this count).

offense.  *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); *Ramos v. State*, 636 S.W.3d 646, 651 (Tex. Crim. App. 2021).

The protection against double jeopardy does not apply to separate and distinct offenses that occur during the same transaction.  *Ex parte Milner*, 394 S.W.3d 502, 506 (Tex. Crim. App. 2013).  To determine if the Double Jeopardy Clause's prohibition against multiple punishments for the same offense has been violated, we assess whether an appellant has been "convicted of more offenses than the legislature intended."  *Id.* at 507 (quoting *Ervin v. State*, 991 S.W.2d 804, 807 (Tex. Crim. App. 1999)); *see Ball v. United States*, 470 U.S. 856, 861, 105 S. Ct. 1668, 1671–72 (1985).  To determine if the legislature intended to treat an appellant's acts as a single offense or as multiple offenses, we must ascertain the "allowable unit of prosecution" from the statutory text and any available legislative history.  *Milner*, 394 S.W.3d at 507; *see Sanabria v. United States*, 437 U.S. 54, 69–70, 98 S. Ct. 2170, 2181–82 (1978); *Ex parte Hawkins*, 6 S.W.3d 554, 556–57 (Tex. Crim. App. 1999).  "Although this inquiry resolves the double[-]jeopardy analysis, it is purely one of statutory construction."  *Harris v. State*, 359 S.W.3d 625, 629 (Tex. Crim. App. 2011) (quoting *Jones v. State*, 323 S.W.3d 885, 888 (Tex. Crim. App. 2010)).  Statutory construction is a question of law, which we review de novo.  *Id.*; *see also State v. Donaldson*, 557 S.W.3d 33, 40 (Tex. App.—Austin 2017, no pet.) (stating that a de novo review is the appropriate standard of review to be employed when reviewing the trial court's decision to quash counts in the indictment).

**B. Analysis**

In ascertaining the "allowable unit of prosecution" for EOCA, we note that a dissenting opinion from the Texas Court of Criminal Appeals has previously discussed this concept:

> We have held that, for double[-]jeopardy purposes, the allowable unit of prosecution for robbery is each victim. The same could be said for [EOCA] by committing theft—the allowable unit of prosecution would be each victim. We have also held that "same offense" means the "identical criminal act." Essentially, if there is one victim, there is one criminal act, and one offense; but if there are two victims, there are two offenses.

*Bailey v. State*, 87 S.W.3d 122, 130 (Tex. Crim. App. 2002) (Keasler, J., dissenting) (footnotes omitted).[35] Here, each of the EOCA counts alleged a separate predicate offense and a separate victim: Count 1 alleged the murder of the victim, and Count 3

---

[35]Although *Bailey* did not involve the "as a member of a criminal street gang" portion of the EOCA statute but instead dealt with the initial portion of the statute that pertains to a combination that collaborates in carrying out criminal activities, we conclude that this portion of the dissenting opinion is instructive for the situation we have before us. The Court of Criminal Appeals has previously segregated the "combination" portion of the statute and treated it separately from the "as a member of a criminal street gang" portion. *See, e.g.*, *Zuniga*, 551 S.W.3d at 735 (applying the statute's intent clause only to the phrase that immediately follows it—"in a combination or in the profits of a combination"—but not to the subsequent phrase, "or as a member of a criminal street gang"); *O'Brien v. State*, 544 S.W.3d 376, 384 & n.23 (Tex. Crim. App. 2018) (holding that EOCA with the "intent to establish, maintain, or participate in a combination" is a "circumstances of the conduct" offense but expressly declining to decide the gravamen for EOCA committed "as a member of a criminal street gang"). Although Appellant seeks to have us apply *O'Brien*, which treated the underlying predicate offenses as alternative manner and means of committing a single offense, it does not deal with the portion of the EOCA statute that is before us and specifically declined to address the gang-member portion of the EOCA statute. 544 S.W.3d at 384 & n.23.

alleged the assault of Tomlin. Counts 1 and 3 therefore did not put Appellant in jeopardy for the same offense.

Additionally, Appellant's challenge to the language of Section 71.02(a)—which states that "'the person commits an offense if . . . the person commits . . . one or more of the following' predicate offenses"—is thwarted by Section 71.03. Under Section 71.03, "[i]t is no defense to prosecution under Section 71.02 that . . . a person has been charged with, acquitted, or convicted of any offense listed in Subsection (a) of Section 71.02." Tex. Penal Code Ann. § 71.03(3). As noted, Subsection (a) of Section 71.02 sets forth the offense of EOCA. *See id.* § 71.02(a). A plain reading of Section 71.03(3) is that it is no defense to prosecution under Section 71.02 that a person has been charged with other counts of EOCA. Had the Texas Legislature intended to prohibit multiple convictions for EOCA, it could have specified in Section 71.03(3) that "[i]t is no defense to prosecution under Section 71.02 that . . . a person has been charged with, acquitted, or convicted of any *of the predicate offenses listed under* Subsection (a) of Section 71.02." Because the Texas Legislature did not limit the wording in Section 71.03(3) solely to the predicate offenses, we can surmise that it indicated with sufficient clarity its intention that a defendant may be charged with multiple counts of EOCA. *See, e.g., Baker*, 2020 WL 1808292, at *8–10 (addressing a different double-jeopardy challenge but affirming four EOCA convictions arising out of the murder of Brady and the aggravated assaults of Antes, Dudley, and Anderson after concluding that the evidence was sufficient to support those convictions); *cf.*

50

*Parkman v. State*, Nos. 02-22-00280-CR, 02-22-00281-CR, 2023 WL 7210160, at *4–5 (Tex. App.—Fort Worth Nov. 2, 2023, no pet.) (mem. op., not designated for publication) (affirming, without facing a double-jeopardy challenge, three counts of EOCA—based on murder, aggravated assault with a deadly weapon, and deadly conduct by shooting—after concluding that the evidence was sufficient to show that appellant was the shooter).  Appellant's double-jeopardy challenge therefore fails.

Because Appellant was not punished twice for the same offense when he was charged with EOCA in Counts 1 and 3, we hold that the trial court did not err by denying Appellant's motion to quash.  We overrule Appellant's fourth issue.

## V.  Denial of Charge Clarification

In his fifth issue, Appellant contends that the trial court erred by denying his request for a jury charge "more clearly defining 'as a member of a criminal street gang.'"  Relying on case law that has defined a "member" as one of three or more persons with a common identifying sign, symbol, or identifiable leadership and who continuously or regularly associates in the commission of criminal activities,[36] Appellant argues that the trial court should have included Texas Civil Practice and Remedies Code Section 125.061's definition for "continuously or regularly"—at least five times in a period not more than twelve months.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 125.061(2) (setting forth definitions in subchapter entitled "Membership in Criminal Street Gang or Foreign Terrorist Organization" that is in a chapter entitled

---

[36]*See Martin*, 635 S.W.3d at 678; *see also Zuniga*, 551 S.W.3d at 735.

"Common and Public Nuisances" and is unrelated to the Penal Code section at issue).[37] Because the EOCA statute does not require multiple crimes to have been committed over any particular span of time and because the Texas Court of Criminal Appeals has held that commission of a single predicate crime will support an EOCA conviction, we rule against Appellant on this issue.

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

An issue similar to the one raised by Appellant was addressed by the Texas Court of Criminal Appeals in *Bittick*. 707 S.W.3d at 367–69. Bittick argued that the "continuous association" requirement for a street-gang member is not satisfied by commission of a single EOCA predicate crime and opined that "a defendant's connection to continuous criminal conduct is required." *Id.* at 368. The *Bittick* court noted that in *Villa* (a prior EOCA case), it did not require proof that Villa had committed any crimes other than the one at issue to establish his gang membership.

[37]As noted by the State, Appellant did not request the instruction that he now contends the trial court should have given. During the charge conference, Appellant requested "language in the charge noting that the offense must be committed as a member of a criminal street gang and that that -- that definition had been set out by the Court of Criminal Appeals in *Zuniga* . . . and was followed up with . . . similar language in *Martin*." The State responded that the charge as drafted adequately tracked the language of the statute, and the trial court denied Appellant's request. Appellant did not request adding Texas Civil Practice and Remedies Code Section 125.061's definition for "continuously or regularly."

*Id.* at 369 (citing *Villa*, 514 S.W.3d at 233). The *Bittick* court then held that any rational jury could have found beyond a reasonable doubt that Bittick had committed aggravated assault as a member of Vagos, a criminal street gang, and stated that those were "the only requirements of an EOCA conviction." *Id.* at 370. *Bittick* distinguished *Martin*, noting that *Martin* interpreted the unlawful carrying of a weapon statute, "which differs significantly from the EOCA statute." *Id.* Thus, the court in *Bittick* held that an EOCA conviction does not depend on a defendant's commission of multiple crimes; instead, a defendant's commission of a single predicate crime will support an EOCA conviction. *Id.* at 367.

Here, as succinctly summarized by the State,

[b]ecause proof that a defendant committed a single predicate act is sufficient to support a defendant's EOCA conviction, [Appellant] cannot show that the trial court committed an error when it did not instruct the jury that "continuously or regularly" meant a defendant must have committed a gang-related criminal offense at least five times in a period of not more than 12 months."

Because we hold that the trial court did not err, we need not address harm. We conclude our analysis and overrule Appellant's fifth issue.

## VI. Admission of Two Exhibits

In an elusive sixth issue that is not listed in his list of issues and is mentioned only in the "Summary of Arguments," Appellant challenges the trial court's decision to admit State's Exhibits 193 and 195 because they were "produced and made available to [him] only a few days before trial." Because Appellant does not provide

53

citations to the record or any authorities and sets forth no analysis in conjunction with this issue, we conclude that he has failed to adequately brief this issue and thus has preserved nothing for our review. *See* Tex. R. App. P. 38.1(i); *Tucker v. State*, Nos. 05-19-01515-CR, 05-19-01517-CR, 05-19-01518-CR, 05-19-01519-CR, 05-19-01544-CR, 05-19-01546-CR, 2022 WL 1564554, at *10 (Tex. App.—Dallas May 18, 2022, pet. ref'd) (mem. op., not designated for publication). Accordingly, we overrule Appellant's sixth issue.

## VII. Conclusion

Having overruled Appellant's six issues, we affirm the trial court's judgments.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 2, 2025